**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG**


**DAN RYAN BUILDERS, INC.**

       **Petitioner,**

**v.**                                                    **Civil Action No.:  3:10-CV-76**

**NORMAN C. NELSON, and
ANGELIA NELSON**

       **Nelsons.**


**PETITIONERS' DAN RYAN BUILDERS, INC. RESPONSE WITH ARGUMENT
TO RESPONDENTS MOTION WITH ARGUMENT TO DENY ARBITRATION**

      **COMES NOW** Dan Ryan Builders, Inc., Petitioner, (hereinafter "DRB") by and through

its counsel, Susan R. Snowden, Jason S. Murphy, and Martin & Seibert, L.C., and in response to

Nelsons' Motion With Argument to Deny Arbitration state as follows:

**STATEMENT OF FACTS**

    1.      Mr. Nelson obtained his Bachelor's degree from Excelsior College.[1]

    2.      Mr. Nelson was previously employed as a Counter-Intelligence Professional.[2]

    3.      Mr. Nelson performed intelligence work at Fort Meade and NASA.[3]

    4.      Mr. Nelson was a supervisor at the Department of Health and Human Services in

Washington, DC.[4]

---

[1] Copies of all relevant deposition transcript pages are provided.  *See* January 12, 2012, Norman Nelson, Deposition Transcript marked as Exhibit 1 hereto, at, p. 12 (lines 3-10).

[2] Exhibit 1, p. 11 (lines 4-5).

[3] Exhibit 1, p. 13 (lines 18-21, 23-24).

[4] Exhibit 1, p. 14 (lines 10-18).

5.      Mr. Nelson performed work as a private investigator.[5]

6.      Mr. Nelson previously owned homes in Carrsville, Georgia and New Market, Maryland.[6]

7.      Mr. Nelson retained Emery Csulak, a professional West Virginia real estate agent, to represent him in purchasing his home from DRB.[7]

8.      Mr. Nelson had his professional real estate agent, Emery Csulak, present at all discussions.[8]

9.      The Nelson's professional West Virginia licensed real estate agent was present when DRB's Sales Representative, Cathy Ho, was reviewing the contract.[9]

10.     The Nelson's professional West Virginia licensed real estate agent did not ask any questions of Mrs. Ho regarding the contract, nor did he take the Nelsons aside to privately discuss the agreement.[10]

11.     The Nelsons hired their own personal property inspector who performed a professional inspection before the closing.[11]

12.     Mr. Nelson testified that the items that needed to be complete prior to the closing consisted of outside work, namely grading and landscaping.[12]

---

[5] Exhibit 1, p. 12 (lines 17-22).

[6] Exhibit 1, p. 22 (lines 14-18).

[7] Exhibit 1, p. 20 (lines 6-8).

[8] Exhibit 1, p. 41 (lines 4-6).

[9] Exhibit 1, p. 42 (lines 21-24).

[10] Exhibit 1, p. 43 (lines 1-3).

[11] Exhibit 1, p. 47 (lines 18-21).

[12] Exhibit 1, p. 73 (lines 21-24).

13.     Mr. Nelson discussed his concerns over work to be completed with his professional West Virginia licensed real estate agent before the closing.[13]

14.     Mrs. Nelson testified that she left the negotiating to her husband.[14]

15.     The Nelsons, prior to the filing of their lawsuit, never expressed to any person at DRB that they wanted DRB to take the house back.[15]

## PROCEDURAL BACKGROUND

1.     A civil action was commenced by Plaintiffs, Norman and Angelia Nelson on May 18, 2010, in the Circuit Court of Berkeley County, West Virginia.  The case sought damages against DRB, their residential home builder, for breach of contract, negligence, and fraud, as a result of alleged defects in construction.  Particularly, the Plaintiffs' asserted that their home had a defective septic system and other defects, making it uninhabitable.

2.     The Agreement of Sale specifically provides, at Paragraph No. 19, that:

> Any dispute arising under or pursuant to this Agreement, or in any way related to the Property and/or with respect to any claims arising by virtue of any representations alleged to have been made by Us, or any agents and/or employees thereof … shall be settled and finally determined by arbitration and not in a court of law, irrespective of whether or not such claim arises prior to or after Settlement hereunder …

3.     On May 28, 2010, the Nelsons disregarded their contractual agreement to arbitrate their claims by filing a civil action in state court case, *Norman C. Nelson and Angelia Nelson v. Dan Ryan Builders, Inc. and Eagle Excavating and Contracting, LLC,* Civil Action No.: 10-C-

---

[13] Exhibit 1, p. 77 (lines 13-17).

[14] *See* February 2, 2012, Angelia Nelson, Deposition Transcript marked as Exhibit 2, at p. 17 (lines 21-23).

[15] Exhibit 2, p. 20 (lines 20-23).

432 in the Circuit of Berkeley County, West Virginia.  DRB was served with a Summons and Complaint on June 17, 2010.

4.      On July 15, 2010, DRB wrote to the Nelsons' counsel demanding arbitration of the Nelsons' claims and enforcement of all applicable provisions of the parties' agreement and advising Nelsons' counsel that Judge Bailey had just recently ordered arbitration in a similar case on an identical contract provision, namely *Frederick and Maxine Ciampi v. Dan Ryan Builders, Inc.*, Civil Action No.: 3-10-CV-55.

5.      On July 19, 2010, DRB answered the state court Complaint, raising the existence of the arbitration clause as an affirmative defense.

6.      The Nelsons refused to honor their agreement to arbitrate; therefore, on August 6, 2010, DRB filed a petition for arbitration in federal court, pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1, *et seq.*  Specifically, § 4 of the FAA provides that "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement to arbitrate matters may petition a United States district court … for an order directing that such arbitration proceed in the manner provided for in such agreement."  9 U.S.C. § 4.  On December 23, 2010, the Honorable John Preston Bailey denied the DRB's Motion to Compel Arbitration.

7.      On January 18, 2012, DRB filed a Motion to Amend or Alter Judgment Pursuant to Rule 59(e) of the Federal Rules of Civil Procedure or, in the Alternative, for Reconsideration.

8.      On February 14, 2011, the Honorable John Preston Bailey denied DRB's Motion to Amend or Alter Judgment Pursuant to Rule 59(e) of the Federal Rules of Civil Procedure or, in the Alternative, for Reconsideration.

9.      DRB filed a Notice of Appeal to the U.S. Court of Appeals for the Fourth Circuit on March 9, 2011.

10.    The United States Courts of Appeals for the Fourth Circuit exercising the privilege afforded to it by the state of West Virginia through the Uniform Certification of Questions of Law Act, West Virginia Code §§ 51-1A-1 - 51-1A-13 requested that the Supreme Court of Appeals of West Virginia certify the following question:

> Does West Virginia law require that an arbitration provision, which appears as a single clause in a multi-clause contract, itself, be supported by mutual consideration when the contract as a whole is supported by adequate consideration.

11.    After issuing an Order with the briefing schedule, and after having an opportunity to read all briefs and hear oral argument, the West Virginia Supreme Court of Appeals issued an opinion on November 19, 2012, answering the certified question from the United States Court of Appeals for the Fourth Circuit.

12.    After receiving the West Virginia Supreme Court of Appeals answer to the certified question, the United States Court of Appeals for the Fourth Circuit issued an unpublished per curiam opinion on January 29, 2013, vacating and remanding the judgment of the district court, and remanding for further proceedings consistent with its Order.

13.    On February 12, 2013, the United States District for the Northern District of West Virginia transferred the civil case to this Court and vacated the February 15, 2013, Status Conference.

14.    On May 7, 2013, the Nelsons filed a Motion With Argument to Deny Arbitration.

## **LEGAL ARGUMENT**

In *Dan Ryan Builders, Inc. v. Nelson*, 11-1215 (2012) the West Virginia Supreme Court of Appeals concluded that the West Virginia's law of contract formation only requires that a contract as a whole be supported by adequate consideration.  The Court opined that a single clause within a multi-clause contract does not require separate consideration.  *Id*.  The Court

further opined that under the doctrine of unconscionability, a trial court may decline to enforce a contract clause – such as an arbitration provision if it is unconscionable.

Arbitration must be compelled in this case.  Pursuant to *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500-01 (4th Cir. 2002) arbitration should be compelled if there is 1) the existence of a dispute between the parties; 2) a written agreement that includes an arbitration provision which purports to cover the dispute; 3) relationship of transaction which is evidenced by agreement to interstate or foreign commerce; and 4) the failure, neglect, or refusal of the defendant to arbitrate.

Here, there can be no dispute that there was an existence of a dispute between the parties. This is evidenced clearly by the filing of a lawsuit by the Nelsons.  Secondly, there is undoubtedly a written agreement that includes an arbitration provision, here specifically Paragraph No. 19 of the Agreement of Sale.  Thirdly, the contract at issue is related to interstate commerce, as it was formed between a corporation in Maryland, in relation to the construction of a home that was being built in Berkeley County, West Virginia, with materials that were transported through channels of interstate commerce.  Lastly, the Nelsons have failed to arbitrate which is clearly evidenced by the filing of their lawsuit against DRB.

As DRB has satisfied every element required to compel arbitration, the burden shifts to the Nelsons, and it is incumbent upon the Nelsons to present a viable defense to the enforceability of arbitration clause.  Here, the Nelsons argue that the clause is unenforceable because it is unconscionable.  In order to show unconscionability, the Nelsons must show both "gross inadequacy in bargaining power" and terms "unreasonably favorable to the stronger party".  *See Adkins*, 303 F.3d at 502 (quoting *Troy Mining Corp. v. Itmann Cole Co.*, 176 W.Va. 599, 603, 346 S.E.2d 749, 753 (1986)).  A finding of "gross inadequacy in bargaining power" typically requires that the transaction involved:  1) elements of deception or compulsion; 2) a weaker party with no meaningful alternative; or 3) a weaker party who did not appear to assent

- 6 -

to the terms challenged as unfair. *See Troy Mining Corp.*, 346 S.E.2d at 753 (quoting RESTATEMENT) 2nd OF CONTRACTS § 234 cmt. d at 111).

The West Virginia Supreme Court of Appeals has indicated that when performing a legal analysis of the doctrine of unconscionability it is imperative to distinguish between procedural and substantive unconscionability.  See *Drake v. West Virginia Self-Storage*, 203 W.Va. 497 (W.Va. 1998) (providing an analysis of the Doctrine of Unconscionability).  The *Drake* Court specifically held that "unconscionability may be divided into two categories:  procedural and substantive.  Procedural unconcsionability is involved with the inequities and unfairness of the bargaining process.  Substantive unconscionability is involved with determining unfairness in the contract itself." *Drake*, 203 W.Va. at 500 (citing *McGinnis v. Cayton*, 173 W.Va. at 114).

More recently, in *Pingley v. Perfection Plus Turbo-Dry, LLC*, No. 11-1605 (2013), the West Virginia Supreme Court reiterated that unconscionability should be reviewed under a two tiered analysis, namely, a procedural unconscionability analysis and substantive unconscionability analysis. *Id.*, at 9.  In *Pingley*, the Court in performing its two tiered analysis did not find a great disparity in the relative position of the parties.  *Id.*, at 10.  The Court opined that the evidence of record did not reflect that Perfection Plus held "either a monopolistic or oligopolistic position in [this] particular line of commerce."  *Id.*  The Court also opined that although the Pingley's were not sophisticated business people, there was nothing in the record to suggest that they were illiterate or particularly unsophisticated regarding normal business decisions affecting the household. *Id.*  With respect to the substantive unconscionability analysis, the Court opined that there was nothing that gave rise to an inference the "Pingley's were 'unwary' and taken advantage of." *Id.*, at 12.

1.     **The subject arbitration agreement is not unconscionable.**

    A.     **The arbitration provision is not procedurally unconscionable.**

The Nelsons claim that the language of the Arbitration agreement is one-sided and, thus, unconscionable and unenforceable. However, in arriving at this conclusion, the Nelsons ignore the facts and misapply the law. The Nelsons repeatedly suggest that the contract was presented on a "take it or leave it basis." However, this is merely an unsubstantiated conclusion.[16] The Nelsons admit that they bargained for the price of the home.

Secondly, the Nelsons had the choice of using their own lender, National Bank of Kansas City.[17] The Nelsons also had occasion to hire Emery Csulak, a professional West Virginia licensed agent, who was by their side at all times.[18] Mr. Nelson claims the contract was full of pre-printed boiler-plate language. However, this can be said of almost all contracts in the United States. *State ex rel. Dunlap v. Berger,* 211 W.Va. 549, 567 S.E.2d 265, 273 (2002). There is no evidence to suggest that either the Nelsons or their realtor discussed the possibility or were prevented from bargaining for other provisions in the contract.

When Mr. Nelson was questioned at his deposition regarding negotiations that occurred during the Agreement of Sale, he stated as follows:

> Q.     During all these discussions was your agent with you?
> A.     Yes.
>
> Q.     At anytime did your agent during these discussions on May 16 say, Stop, that doesn't sound right, we need to talk to somebody?
> A.     What doesn't sound right?

---

[16] *See* Document No. 29, at para. 26.

[17] Exhibit 1, p. 42 (lines 11-12).

[18] Exhibit 1, p. 41 (lines 4-6).

> Q.      Anything.
> A.      No.[19]
>
> Q.      At any time, did your agent ask any questions of Mrs. Ho?
> A.      No, not that I recall.
>
> Q.      At anytime, did your real estate agent take you aside or stop you and point out different things in the contract that you and your wife should be familiar with?
> A.      Not that I recall.[20]
>
> Q.      As Mrs. Ho is reviewing the sixty page document that you referred to in your log with you, was your agent there?
> A.      Yes.[21]

This conclusively shows that the parties were present, participated, and bargained during the negotiation of the Agreement of Sale.  The undisputed evidence reveals that the Nelsons and their real estate agent did not attempt to bargain with regard to the arbitration provision in question.  Here, the Nelsons had full knowledge of what was taking place and had ample opportunity to inspect the Agreement of Sale – including the arbitration provision, before executing it.  Furthermore, they were represented by a real estate agent hired by them to represent them in the purchase of a home, an agent whose primary responsibility includes assisting customers in real estate purchases.  The evidence is clear.  The Nelsons cannot claim that they were denied "meaningful alternatives" when they have not produced any evidence to show that they requested or were denied such alternatives.  There is no evidence that the Nelsons questioned the arbitration clause or that they asked that it be modified or deleted.

Even assuming *arguendo* that the Nelsons were presented with a contract on a "take it or leave it" basis, it would not change the facts in question.  DRB was not the only residential

---

[19] Exhibit 1, p. 41 (lines 4-13).

[20] Exhibit 1, p. 43 (lines 1-3).

[21] Exhibit 1, p. 42 (lines 21-24).

builder in operation in Berkeley County, West Virginia.   If the Nelsons were unable to successfully negotiate any terms that they did not like, they could have simply gone to another builder.  *See Saturn Distr. Corp. v. Williams*, 905 F.2d 719 (727) (4th Cir. 1990) ("[T]he mere fact that Saturn requires dealers to agree to its arbitration provision in order to obtain a Saturn dealership does not make its Dealership Agreement non-consensual.  If a dealer does not wish to agree to a non-negotiable arbitration provisions, the dealer need not do business with Saturn.") *Id*.

The Nelsons maintain that DRB required them to place a deposit on the home in order to hold it.  This however, is a common practice in the industry and cannot be viewed as nefarious behavior.

DRB's Sales Representative, Cathy Ho, testified that she did not precisely remember how many customers were interested in purchasing the home.

…

A.      I may or may - …

A.      I – don't recall the amount of customer that we had on it …[22]

Cathy Ho specifically testified that she went through the entire contract with the Nelsons.

> Q.      Ok.  Alright.  Can you look through here and tell me which portions you might have stopped and explained to Mr. Nelson?
> A.      I – I would go through the whole contract, it's not just portions of it, I would go through the first page and go through the highlights of what's important on that page.[23]

---

[22] *See* November 29, 2011, Loananh "Cathy" Ho, Deposition Transcript, marked as Exhibit 3 hereto, at p.18 (lines 14-21.

[23] Exhibit 3, p. 20 (lines 15-20).

The Nelsons claim they were refused access to the home until Mr. Nelson paid a deposit. However, when asked whether it would be unusual for a buyer to sign a contract for a home without first being shown the premises, the DRB sales representative testified,

> Q.      Alright.  Wouldn't it be unusual for you not to have been at the home with the purchaser prior to the house selling?
> A.      No.  Like I explained to you, if there were no agents involved, then it – it would definitely be very unusual, it would be buying … a house without seeing it.  But when there is an agent involved, many times the agent would be the one that would access the home with the buyer.  And sometimes they don't want us out there because they just don't want us pressuring their buyer or trying to talk because they have five or six other listings they want to take the buyer to …[24]

Again, the Nelsons had their own real estate agent.  Also, Mr. Nelson points to the fact that he received the benefit of a reduced sales price even though he chose to use his pre-approved lender, National City Bank of Kansas.  However, this can only be viewed as a modicum of flexibility between DRB and the Nelsons in this specific transaction.  Here, there was a ready, willing and able seller, coupled with a ready, willing and able buyer.  This concession expressly repudiates the notion of unconscionability.

Put simply, the Nelsons are unable to provide any evidence of "gross inadequacy in bargaining power" to support their unconscionability argument.  The Nelsons attach an affidavit from neighbor, James Dunleavy.  The Nelsons assert that Mrs. Ho went to Mr. Dunleavy's doorstep before Dunleavy was to meet the Nelsons.[25]  Mr. Dunleavy's affidavit reads that Mrs. Ho asked Mr. Dunleavy not to say anything bad about DRB's alleged "issues" with their homes.[26]  Mr. Dunleavy feared repercussions from DRB if he said anything derogatory.[27]

---

[24] Exhibit 3, p. 23 (lines 19-24), p. 24 (lines 2-7).

[25] *See* Document 63-4, at paras. 3-5.

[26] Document 63-4, at para. 5.

However, Mr. Dunleavy's version of events is completely contradicted by Mrs. Ho.  Mrs. Ho's testimony was that Dunleavy's statement was "absolutely false."[28]  Mrs. Ho testified:

> A.    the statement that he said I asked him not to say anything negative …I know to be totally false.[29]

Mr. Nelson's affidavit describes how he was allegedly taken advantage of by DRB. What is noticeably absent from his affidavit is the fact that he hired a professional realtor.  This cannot be overlooked.  Although the Agreement of Sale and the negotiation process between Mr. Nelson and DRB was not unconscionable, the fact that Mr. Nelson had a professional real estate agent representing him, who was present with the Nelsons, underscores the futility of the Nelson's unconscionability argument.  The Nelsons complain that the arbitration provision was "thrust upon them" and that they were "unwary and taken advantage of".[30]  However, Mr. Nelson admits that he read almost nothing in the contract.[31]  Respondent Nelson claims that he had no role in the input or formulating of the Agreement of Sale.[32]  Mr. Nelson claimed that after he signed everything, that the sales person quickly flipped through each page and had him initial stating that it was standard protocol.[33]

Even assuming these bold assertions as true, to the extent the Nelsons were unsure, unaware, or confused, it was incumbent upon them to raise these issues with their realtor and/or

---

[27] Document 63-4, at para. 10.

[28] Exhibit 3, p. 37 (line 21).

[29] Exhibit 3, p. 40 (lines 17-21).

[30] Document 63-2, at para. 33.

[31] Document 63-2, at para. 35.

[32] Document 63-2, at para.  36.

[33] Document 63-2, at para. 37.

Mrs. Ho.  Instead, they allegedly sat in silence.  Moreover, their professional real estate agent, to the extent there were any problems, miscommunications, or concerns with the negotiation process, had every opportunity to raise those concerns.

Mr. Nelson claimed that he was not specifically advised about arbitration and that he was unaware of how it was different than going to court.[34]  Mr. Nelson asserted that he was misled concerning the dispute process with DRB and that if he had not been mislead concerning the dispute process, he would have never signed the agreement with DRB.[35]  These bold conclusions fail to address how he was misled.  Further, his affidavit also fails to specifically describe how his realtor was misled.  The affidavit raises issues regarding alleged basement flooding and does not concern itself with unconscionability. This is not a matter to be analyzed with respect to unconscionability.  The issue of whether or not the basement was, and to what extent, flooded is a factual allegation which is in dispute.  Mrs. Ho testified:

> Q.     Ok.   Do you know to this day whether that basement flooded?
> A.     I – No, I – what – what I was told is that there was a sump pump electrical stoppage.
>
> Q.     But Mr. Wolf didn't ever tell you there was anything like four inches of water –
> A.     Mm – mmm.
>
> Q.     In that basement, right,
> A.     Mm – mmm.  No.[36]

The Nelsons submit the Affidavit of Emery Csulak to support their argument that the Agreement of Sale and underlying process was unconscionable.  In pertinent part, the affidavit

---

[34] Document 63-2, para. 44.

[35] Document 63, paras. 46, 49.

[36] Exhibit 3, p. 41 (lines 6-14).

reads that Mr. Nelson was unsatisfied that some things were not completed prior to closing.[37] The affidavit reads that Mr. Nelson threatened not to close on the home.[38] The affidavit states that the attorney at the settlement came back in after speaking with DRB, and that a sales person from DRB would arrive with an additional contract addendum in order to ensure that the work that was allegedly not complete would be done.[39] The affidavit shows that Mr. Nelson grumbled, but agreed to sign the addendum.[40] The affidavit then states that some mathematical computational errors were found which were quickly adjusted, but that the settlement concluded.[41]

      The affidavit of Emery Csulak does not show procedural unconscionability. In fact, it generally tends to show a typical settlement for the purchase of a home. Settlements are often stressful and frustrating, and often have one or both sides bickering over numerous things, i.e., contingencies, timing, and logistics. The facts illustrate that Mr. Nelson, although he may have been slightly displeased, was engaged in the process and had the benefit of his real estate agent. Mr. Nelson appeared to rely upon the advice of his realtor and made his own decisions.

      At the settlement, Steven Mathias, Esq. represented, in the conduct of the settlement, the lender, buyer, and seller.[42] Mr. Mathias was not sure if DRB or the buyer informed National

---

[37] Document 63-5.

[38] Document 63-5.

[39] Document 63-5.

[40] Document 63-5.

[41] Document 63-5.

[42] *See* September 7, 2010, Transcript of Evidentiary Hearing and Argument of the Defendant's Motion to Disqualify Counsel ("Evidentiary Hearing"), marked as Exhibit 4 hereto, at p. 7 (lines 5-9).

Bank of Kansas City that he was handling the closing.[43]  Mr. Mathias read the pertinent parts of the sales contract that he needed to conduct the settlement.[44]  Mr. Mathias was not present during the drafting of the Agreement of Sale.[45]  More specifically, Mr. Mathias was "not involved whatsoever in the preparation of the contract or negotiations or anything."[46]  Mr. Nelson's counsel stated that there was an agreement where each of the parties agreed to do something – both forewent some of their opportunities like have another attorney and having things treated confidentially.[47]

Mr. Nelson testified that at the closing the nature of the dispute was that there was work to be done outside prior to closing as stated in the addenda and that said work was not completed.[48]  When asked what the problem was Mr. Nelson testified:

> Mr. Mathias asked me specifically what the problem was and I told him that there was a problem with the grading and seeding and there was also some construction debris and whatnot on the property that they were supposed to remove that they never removed, and I was upset and that I was not going to close on the property.[49]

Mr. Nelson's testimony also shows him enforcing the contract terms and that he was knowledgeable.  Mr. Nelson testified:

---

[43] Exhibit 4, p. 22 (lines 22-25); p. 8 (line 1).

[44] Exhibit 4, p. 10 (lines 12-15).

[45] Exhibit 4, p. 11 (lines 16-19).

[46] Exhibit 4, p. 12 (lines 5-6).

[47] Exhibit 4, p. 17 (lines 9-14).

[48] Exhibit 4, p. 55 (lines 6-9).

[49] Exhibit 4, p. 57 (lines 7-12).

A. …

I had it in writing in the contract.  It stated specifically in there what they would do and there was a time limit that they would do it in.[50]

Q.     What did you say?
A.     I told him I was not willing to do that because they had not fulfilled their promise.[51]

A.     I told him I was not going to close on the house.[52]

Mr. Nelson's testimony also discussed his contract negotiations with DRB:

A.     Actually, I was -- in the contract, there was some discussion about they had affiliated business arrangements and one of the affiliated business arrangements, I believe, was with a company called Keystone Title Service and Settlement Company. So, initially I thought with that affiliated business arrangement because they mentioned they would be doing the title related stuff. So it was a little bit confusing, but they did tell me in West Virginia I had to have an attorney do a closing.[53]

Mr. Nelson knew at the time of signing the agreement he had a right to retain his own attorney.

A.     Yes, at the time I signed the agreement I knew I had the right to get my own attorney.[54]

Mr. Nelson also had occasion to complete a survey form regarding his settlement experience.  Mr. Nelson wrote:

Todd did a good job and we are satisfied with the overall quality of the home.  My only recommendation is to follow up to insure subs complete work as agreed.[55]

---

[50] Exhibit 4, p. 57 (lines 22-25).

[51] Exhibit 4, p. 58 (lines 2-3).

[52] Exhibit 4, p. 58 (line 9).

[53] Exhibit 4, p. 62 (lines 20-25); p. 63 (lines 1-3).

[54] Exhibit 4, p. 64 (lines 2-3).

Mr. Nelson further testified:

> If I had thought at that time there was a significant problem, no. I would not have closed on it.[56]

The Nelsons have made no showing that they did not have any meaningful alternatives. The Nelsons have failed to prove that they did not appear to assent to the terms challenged as unfair. Mr. Nelson is educated, literate and signed and initialed all of the pages of the Agreement of Sale. The Nelsons retained a real estate agent to represent their interest. The Nelsons are not elderly or unsophisticated. There is simply no evidence to show that the Nelsons did not understand their alternatives. The Nelsons negotiated the purchase price of his home and there is simply no showing that the arbitration clause was ever requested to be modified or deleted.

In conclusion, the Agreement of Sale and overall contractual process between the parties is not procedurally unconscionable.

**B.      The Arbitration provision is not substantively unconscionable.**

Substantive unconscionability involves unfairness in the contract itself and whether a contract is so one-sided and will have an overly harsh affect on the disadvantaged party. The factors to be weighed in accessing substantive unconscionability vary with the content of the Agreement. Generally, courts should consider the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of risks between the parties, and public policy concerns. Syl. Pt. 19 (*Brown v. Genesis Healthcare Corp*., 228 W.Va. 646, 724 S.E.2d 250 (2011).

---

[55] Exhibit 4, p. 67 (lines 9-11).

[56] Exhibit 4, p. 68 (lines 11-12).

The Nelsons assert that Paragraph No. 19 is substantively unconscionable as it allows DRB to opt out for either court or arbitration if it seeks to enforce the Agreement of Sale. The Nelsons misinterpret Paragraph No. 19. The Nelsons contend that DRB had the flexibility to either opt out for court or to choose arbitration if it wished. Paragraph No. 19 states that if the purchaser "defaults" by failing to settle on a property, then DRB may either pursue a case in court or by way of arbitration. This language is limited only to default (failure to settle). In this case, the Nelsons did not fail to settle, thus, this language is inapplicable to the case at hand. The arbitration provision clearly states that any dispute arising under or pursuant to the agreement must be settled subject to arbitration. Accordingly, the applicability of the arbitration clause is not optional for DRB (except for the default provision). Rather, it is mandatory for both parties. It is mutual and enforceable by both parties.

The Nelsons also fail to show that the contract, considered as a whole, is so unfairly one-sided and unconscionable. Nearly every provision within any contract will favor one party over the other, and their bargain is struck in the trade-offs among the numerous provisions. If it were a requirement that each and every provision of a contract equally favor and burden both parties then virtually every single contract would fail. A determination of one-sidedness cannot focus on a single provision but must look to the entirety of the contract. The West Virginia Supreme Court of Appeals has recognized this as the appropriate perspective from which this issue must be considered to determine if, in this instance, it unfairly favors DRB. *State ex rel. Saylor v. Wilkes*, 216 W.Va. 766, 613 S.E.2d 914 (2005); *Troy Mining Corp. v. Itmann Co.*, 176 W.Va. 599, 346 S.E.2d 749 (1986).

Mr. Nelson maintains that he did not assent to the arbitration provision and that he was guided past it by Cathy Ho who specifically told him that some provisions would not apply and that the entirety of the actions leading up to execution were deceptive. However, failure to read

and understand the terms of a contract is insufficient for avoidance. "In the absence of extraordinary circumstances, the failure to read a contract before signing it does not excuse a person from being bound by its terms." *Reddy v. Cmty. Health Found. of Man*, 171 W.Va. 368, 373, 298 S.E.2d 906, 910 (1982). The Nelson's argument of deception or fraud in the inducement is an arbitrable issue, not one of avoidance. *Prima Paint Corp. v. Flood and Conklin Mfg. Co.*, 388 U.S. 395 (1967); *Snowden v. Checkpoint Check Cashing*, 290 F.3d 631, 637-38 (4th Cir.), *cert. denied*, 537 U.S. 1087 (2002).

The Nelsons argue that the American Arbitration Association ("AAA") is not an impartial system and has at least an indirect business relationship with one of the parties and an incentive to please one of the parties. This argument has no merit. This is not forum shopping or a flawed bias system as posited by the Nelsons. Arbitration is a well-recognized and expedient alternative to litigation. In *State ex rel. Wells v. Matisch*, 215 W.Va. 686, 600 S.E.2d 583 (2004), the West Virginia Supreme Court of Appeals articulated that the mere assertion of what a party believes the costs it will incur is not sufficient to invalidate an arbitration provision. Here, the Nelsons speculate that the cost of arbitration may be approximately $11,450.00. Thus, as set forth in *Matisch*, this argument should be disregarded. Moreover, the Nelsons cannot show that the cost is unreasonable in light of the fact that civil litigation and its costs are undoubtedly much higher.

In conclusion, the Nelsons have failed to show that the terms unreasonably favor the "stronger party". The arbitration provision is not substantively unconscionable, and this Court is required to resolve any doubts concerning the scope of arbitrable issues in favor of arbitration. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765, (1983).

**C.** **Angelia Nelson is bound by the arbitration provision as a non-signatory third-party beneficiary.**

The Nelsons strenuously contend that Mrs. Nelson never signed the Agreement of Sale, and is therefore not bound to arbitrate.  However, the law clearly binds non-signatories to arbitration agreements where equity requires.  In fact, non-signatory agents have been bound to arbitrate under several theories.  *See Thomson-CSF, S.A.V. American Arbitration Assoc.* 64 F.3d 773, 776 (2nd Cir. 1995).  In *Long v. Silver*, 248 F.3d 309 (4th Cir. 2001), the 4th Circuit Court of Appeals opined that in a particular case there was little difference between the parent company (that had signed the Arbitration Agreement) and its subsidiary in a corporation and its shareholders.  The court found that the facts and claims against the corporation and its shareholders were so closely interconnected that the claims against non-signatory shareholders were of the corporation were referable to arbitration even though they had not signed the Arbitration Agreement.  *See Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411-416 (4th Cir. 2000).

The Nelsons are both named plaintiffs in the state court proceeding and at no time alleged in their Complaint that Angelia Nelson was not an owner of the home.  It is undeniable that Ms. Nelson is a third-party beneficiary to the contract for purchase which was signed by Mr. Nelson. Notwithstanding representations to the contrary, the plaintiffs have even admitted in their Complaint that they purchased a home.

**D.** **The Doctrine of Equitable Estoppel mandates that the arbitration provision be enforced against Angelia Nelson, the non-signatory.**

Mrs. Nelson argues that she should not be required to submit to arbitration because she did not sign the contract for sale.  Although it is true that she did not sign, she is estopped from arguing that the arbitration provision is inapplicable on that particular ground.  In order to successfully avoid arbitration, the Nelsons posit that Ms. Nelson was not an interested party to

the transaction.  This position is wholly inconsistent with the Nelson's state court pleading where both Mr. and Mrs. Nelson are named plaintiffs.

> In 2008, **Plaintiffs** purchased a home built by Defendant DRB and Eagle located in Berkeley County, West Virginia paying some $385,000.00.[57]

In the Complaint, Mrs. Nelson sues for damages arising out of her purchase of the home, which is the subject of the case.  The specific counts of Mrs. Nelson's Complaint are as follows:

> COUNT I – Fraud-Failed, Illegal Septic System and Othyer (Sic) Defects

> COUNT II – Fraud-Basement Flooding

> COUNT III – Fraud-Substandard Concrete

> COUNT IV – Negligence, Gross Negligence, Willful, Wanton Reckless Misconduct (Property Damage)

> COUNT V – Negligence, Gross Negligence, Willful, Wanton Reckless Misconduct (Bodily Injury)[58]

"The Doctrine of Equitable Estoppel precludes a party from asserting rights he otherwise would have had against another when his own conducts renders assertion of those rights contrary to equity."  *R. J. Griffin and Co. v. Beach Club II Homeowners Ass'n*, 384 F.3d 157, 160-161 (4th Cir. 2004).  Courts have offered much guidance with respect to when the Doctrine should be applied to prevent inequity in non-signatory situations.

In *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, the 4th Circuit Court of Appeals explained that although "arbitration is a matter of contract and a party cannot be required to submit to arbitration, any dispute which is not agreed to submit," it is well established that exception to this general rule exist when equity so demands.  206 F.3d 411, 416 (4th Cir.

---

[57] *See* Document 32 at para. 4 (emphasis added).

[58] Document 32.

2000) (internal citations omitted).  In that case, the 4th Circuit opined that a non-signatory may be estopped from refusing to comply with an arbitration clause where it actually accepts the benefits of the contract containing the clause.  *Id*.  The rationale of the court was that where a party brings an action and asserts claims based upon a contract, the party "cannot seek to enforce those contractual rights and avoid the contract's requirement that any dispute arising out of the contracts being arbitrated."  *Id*., at 418.  *See also, Huges Masonry Co., Inc. v. Greater Clark County Sch. L Bldg. Corp.*, 659 F 2d 836, 838-839 (7th Cir. 1981) (holding that it would be manifestly inequitable to allow a party to assert claims alleging failure to perform under a contract and at the same time deny there are contractual parties to avoid enforcement of an arbitration clause).  In this case, this is what Ms. Nelson attempts to do in this instant litigation. It is manifestly inequitable for Ms. Nelson to assert claims for failure to perform under a contract and now turn around and deny there is a contractual party to avoid enforcement of the arbitration clause.

Similarly in *State ex rel. United Asphalt Suppliers, Inc. v. Sanders*, 204 W.Va. 23, 27 (W.Va. 1998) the West Virginia Supreme Court of Appeals recognized that there are "instances and cases where non-signatories to arbitration clauses may be equitably compelled to pursue their claims against defendant in arbitration."  The Court opined that where the claims are "based on the same facts" and are "inherently inseparable" that "arbitration is permissible with regard to the non-signatory party."  *Id*.  The United States District Court, for the Southern District of West Virginia recently provided guidance on that very issue explaining that:

> Under the equitable estoppel theory, a non-signatory to a contract cannot accept the benefits of the contract to seek to enforce a duty arising from the contract while simultaneously resisting the operation of the contract's arbitration clause.  This legal principle rests on a simple proposition:  it is unfair for a party to 'rely on [a] contract when it works to its advantage, and repudiated when it works to its disadvantage.

*Wilson v. Dell Financial Services, L.L.C.* "2009 WL 2160775 (S.D.W.Va., 2009) (internal quotations omitted) (quoting *Wachovia Bank, N.A. v. Schmidt*, 445 F.3d 762, 769 (4th Cir. 2006).  There, the court further opined that:

> To invoke the theory of equitable estoppel, it is not enough that the non-signatory's claims are "intimately related" to the contract. The non-signatory must have received some direct benefit from the contract.

*Id.*  (Internal citations omitted).

It is apparent that Mrs. Nelson's claims must be deemed "inherently inseparable" and/or "intimately related" to the Agreement of Sale.  The claims of Mrs. Nelson's are based upon the same factual circumstances as those of Mr. Nelson and as such are inherently inseparable and intimately related.  As a spouse and family member of the signatory, Mr. Nelson, Mrs. Nelson's damages are undoubtedly intertwined with those of her signatory spouse.  It is also manifest that she received a direct benefit from the same in the form of the home.  It is further evident that she has willfully received the benefit of the agreement by her pursuit of multiple causes of action arising from the purchase of the home as set forth in her very own Complaint.  The home, to which all of her state court claims relate, was purchased as a result of the signing of the Agreement of Sale which contained the Arbitration Clause.

The Nelson's argument that Mrs. Nelson never signed the Agreement of Sale is of no moment.  As previously discussed *supra*, she is bound as a non-signatory.  It is not a denial of fundamental fairness to Mrs. Nelson.  Indeed, all of Mrs. Nelson's Counts in the lawsuit arise from the Agreement of Sale and depend on the rights found in the contract.

## CONCLUSION

The arbitration provision in the Agreement of Sale is enforceable.  It is neither procedurally or substantively unconscionable under West Virginia law.

Furthermore, Mrs. Nelson is bound by the arbitration provision as a non-signatory, third-party beneficiary.  Mrs. Nelson is also equitably estopped from claiming that the arbitration provision in the contract is unenforceable as against her.

DRB respectfully requests that the Nelson's Motion With Argument to Deny Arbitration be denied and that this Court compel arbitration as between all parties.

Respectfully submitted,

**DAN RYAN BUILDERS, INC.**
**By Counsel**

**MARTIN & SEIBERT, L.C.**

**BY:** /s/ *Susan R. Snowden*
      **Susan R. Snowden**
      **(WV State Bar No. 3644)**
      **Jason S. Murphy**
      **(WV State Bar No. 9965)**
      **1453 Winchester Avenue**
      **P.O. Box 1286**
      **Martinsburg, WV  25402-1286**
      **(304) 267-8985**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG**

**DAN RYAN BUILDERS, INC.**

       *Petitioners*,

**v.**                                **Civil Action No.:  3:10-CV-76
(Groh)**

**NORMAN C. NELSON, and
ANGELIA NELSON**

       *Nelsons*.

## CERTIFICATE OF SERVICE

I, Susan R. Snowden, counsel for Defendant, Dan Ryan Builders, Inc., hereby certify that, on May 28, 2013, I electronically filed the foregoing Petitioners' Dan Ryan Builders, Inc. Response With Argument to Nelsons Motion With Argument to Deny Arbitration**,** with the Clerk of the court using the CM/ECF system which will send notification of such filing to the following CM/ECF participants:

Lawrence M. Schultz, Esquire
Post Office Box 1935
Martinsburg, WV 25402

                               /s/ *Susan R. Snowden*
                                   Susan R. Snowden