**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF WEST VIRGINIA**
**MARTINSBURG**

**DAN RYAN BUILDERS, INC.,**

                   Petitioner,

**v.**                                                    **CIVIL ACTION NO. 3:10-CV-76**
                                                         **(JUDGE GROH)**

**NORMAN C. NELSON and**
**ANGELIA NELSON,**

                   Respondents.

<u>**MEMORANDUM OPINION AND ORDER DENYING IN PART AND GRANTING IN**</u>
<u>**PART RESPONDENTS' MOTION TO DISMISS ARBITRATION**</u>

On May 7, 2013, Respondents Norman C. Nelson and Angelia Nelson filed a

motion to dismiss arbitration [Doc. 63].  On May 28, 2013, Petitioner Dan Ryan Builders,

Inc. ("DRB") filed its response.  On June 14, 2013, Respondents filed their reply.

Petitioner and Respondents attached supporting affidavits and documents to their

pleadings to aid the Court in rendering its decision.  Additionally, on November 15,

2013, the Court held an evidentiary hearing where it received testimony and listened to

arguments of counsel.  For the following reasons, the Court finds that Respondents'

Motion to Dismiss Arbitration should be **DENIED IN PART and GRANTED IN PART**.

## I.  Statement of Facts and Procedural History

The Nelsons are a married couple that ultimately purchased a home in

Hedgesville, West Virginia from DRB.  Mr. Nelson joined the United States Army at age

eighteen, and he spent the majority of his adult life serving as an enlisted soldier.  Resp.

Ex. 2, Nelson Aff. at ¶ 37.    Mr. Nelson served in the Army from 1983 through 1999,

and he achieved the rank of Staff Sergeant.  Pet. Ex. 1, N. Nelson Dep., p. 10, ln. 19-24.  Mr. Nelson is a high school graduate. Id. at p. 9, ln. 19-23.  He also earned a Bachelor's degree from Excelsior College. Id. at p. 10, ln. 9-12.  After his military career, Mr. Nelson worked as a private investigator from 1999 to early 2002.  Id. at p. 12, ln. 11-22.  From 2002 to 2004, Mr. Nelson worked as an intelligence professional in Fort Meade, Maryland.  Id. at p. 13, ln. 21-22.  From 2004 to 2006, Mr. Nelson worked at NASA performing intelligence work.  Id. at p. 13, ln. 23-24; p. 14, ln. 7-8.  After 2006, Mr. Nelson began working at the Department of Health and Human Services as a supervisor in the Program Protection Office.  Id. at p. 14, ln. 9-18.

Mrs. Nelson is also a high school graduate.  Pet. Ex. 2, A. Nelson Dep., p. 7-8.  She has received some higher education and training.  Id.  She studied accounting at City College of Chicago and the University of Maryland, and she has received computer and business administration training. Id.

In early 2008, Mr. Nelson began working with real estate agent Emory Csulak to assist in selling his current home in New Market, Maryland and purchasing a different home.  N. Nelson Dep., p. 16-17.  Mr. Nelson began looking in Georgetown Orchard, a DRB subdivision, because he had found a home he was interested in located in that subdivision on the Internet. Id. at p. 19.  He also liked the Hedgesville, West Virginia area because he was looking for a larger home and thought the area had a pretty good school district.  Id. at p. 17-18.

Upon driving through the Georgetown Orchard subdivision, Mr. Nelson first looked at the home he ultimately purchased from only the outside.  Id. at p. 20.  Later, his real estate agent arranged a tour of the inside of the home with DRB for May 10,

2

2008.  Id. at p. 21.  However, this tour was later postponed to May 16, 2008.  Id.  On

this date, Mr. Nelson, his wife, his real estate agent, and Cathy Ho, a DRB

representative, toured the inside of the home and the lot over a two-hour period.  Id.

      After touring the home and the lot, the Nelsons drove to DRB's divisional office.

While driving to DRB's office, the Nelsons discussed purchasing the home, and, during

this discussion, Mr. Nelson stated he would only purchase the home if he could get it for

the right price.  After they arrived at the office, they were placed in a conference room to

review the contract.  The Nelsons reviewed the contract with Ms. Ho.  This process took

about an hour, and their real estate agent was present during this process.   This was

Mr. Nelson's first new home purchase.  However, he previously purchased two homes

that were existing construction.

      Mr. Nelson entered into a contract with DRB to purchase the home, located at

453 Ploughman Way in the Georgetown Orchards subdivision, for $385,000. The pre-

printed Agreement of Sale ("contract") was seven pages.  The arbitration provision was

on the fifth page.  The acknowledgment that the purchaser read and understood the

agreement was on the seventh page.  The entire agreement, with addenda, was

approximately fifty-six pages.  See Resp. Ex. 1.

      Ms. Ho, a DRB sales representative, reviewed the documents, including the

contract and addenda, with Mr. Nelson.  Pet.'s Ex. 3, C. Ho Dep., p. 19-22.  While

reviewing the contract, Ms. Ho highlighted some of its provisions to Mr. Nelson.  N.

Nelson Dep. p. 44.  Ms. Ho stated that she reviewed the whole contract, not just

portions of the agreement.  C. Ho Dep., p. 19-22.  She would review one page at a time

and cover the "highlights" on that page. Id.  Ms. Ho testified that her usual practice was

3

to explain the arbitration provision and point out that if a problem arose between the purchaser and DRB, the purchaser was willing to go through arbitration instead of to judge and jury in order to save the company money.  She estimated that the review of the contract took approximately an hour and a half to two hours.  Id.

Ms. Ho also stated that she would answer any questions asked by a purchaser. Id.  If she would not know the answer, she would seek clarification from someone else at DRB.  Ms. Ho testified that Mr. Nelson was very astute and tedious, and she described Mr. Nelson as being very careful and taking his time in reviewing the documents.  As Ms. Ho reviewed the documents, the Nelsons' real estate agent was present, but he did not ask any questions.  N. Nelson Dep., p. 42-43. Additionally, the Nelsons' real estate agent did not point out any items that the Nelsons should be familiar with. Id.

During the review of the contract, Mr. Nelson negotiated the price of the home. Id.  Additionally, Mr. Nelson used an outside lender, National Bank of Kansas City, rather than DRB's preferred lender Monocacy Home Mortgage.  The contract had a provision requiring the purchaser to use DRB's preferred lender and title company in order to receive the incentives for the home.  However, Mr. Nelson, negotiated with DRB to continue to use his outside lender and keep the incentives offered by DRB.  N. Nelson Dep., p. 41-42, 44; C. Ho Dep., p. 16.

Mr. Nelson also negotiated quite a few addenda to the contract.  The first handwritten changes to the contract provided that DRB would grade and seed any disturbed area of the home, including the rear and sides of the home.  DRB also agreed to make sure the area to the left of the home, where the septic reserve was located,

4

would be graded and seeded by the time of closing.  Resp. Ex. 1, 49.  The second handwritten addendum stated DRB agreed to grant purchasers "permission to build a storage shed or an inground pool (as long as there will be a 6 foot fence around it) to the side of the property instead of the rear due to the irregularity of Lot 11 at Georgetown Orchards." Resp. Ex. 1, p. 50.  The third handwritten addendum provided that "DRB and the purchaser agrees that this contract is contingent on the settlement of the property located at 10630 Old Barn Road, New Market, Frederick County, Maryland to occur on or before June 16, 2008."  Resp. Ex. 1, 51.  This addendum permitted Mr. Nelson to walk away from the contract if his house had not sold on or before June 16, 2008.  The last addendum provided that DRB would remove the rock/boulders at the side of the septic field and in the high grass area near and in between the apple trees. Resp. Ex. 1, p. 53.  The addendum also provided that DRB would remove construction debris, a broken fence, and piles of dirt from the property at Mr. Nelson's request. Id.

Although the home was a spec home, Mr. Nelson made selections and modifications to it, such as selecting the place for the phone, cable, ceiling fans, and recessed lights. Resp. Ex. 1, p. 13.  Mr. Nelson also upgraded the countertop to granite, the flooring to cherry, and the cabinets to Squire/Village Cherry in a hazelnut color. Id. at 16.  Mr. Nelson selected the colors of the tile and the wall.  He also added Guardian home protection services and selected the location of the alarms and motion detectors.

Prior to closing on the home, the Nelsons hired their own personal property inspector who performed a professional inspection of the home.  N. Nelson Dep., p. 47. Although the inspector was not permitted to damage the home in his inspection, he did provide a thorough inspection that lasted several hours.  On June 13, 2008, prior to

5

closing, Mr. Nelson did a walkthrough of the home.  N. Nelson, Dep. 73.  There were items that needed to be completed prior to the closing scheduled for June 16, 2008, and Mr. Nelson created a "punch list" of items that still needed to be completed.  Id.  On the day of closing, Mr. Nelson drove by the house and noticed that tasks outside of the house were still not completed, such as the grading.

At the closing, Mr. Nelson told the settlement attorney that "there was a problem with the grading and seeding and there was also some construction debris and whatnot on the property that they were supposed to remove that they never removed, and that I was upset and that I was not going to close on the property."  Pet. Ex. 4, p. 9.  As a result, Mr. Nelson and DRB negotiated the June 18 addendum providing for the completion of the additional work.  Mr. Nelson stated that his real estate agent was present at the closing, but he did not retain his own attorney.  However, Mr. Nelson acknowledged that he knew he had a right to consult his attorney to review the contract and attend the closing.  Pet. Ex. 4, p. 12.  Mr. Nelson proceeded with the closing after the settlement attorney created an addendum to the contract providing for the unfinished items to be completed.  Mr. Nelson acknowledged that he never expressed to DRB–even at that point–that he wanted them to take the house back.  N. Nelson Dep., p. 20.

After closing, Mr. Nelson, in responding to DRB's survey regarding the overall construction experience/quality of their home, stated "Todd did a good job and we are satisfied with the overall quality of the home.  My only recommendation is to follow up to insure subs complete work as agreed." Pet. Ex. 4, p. 13.  Mr. Nelson rated the following categories as excellent: (1) the overall sales experience; (2) the overall construction

6

experience/quality of their home; (3) the overall mortgage/loan experience with National Bank of Kansas; and (4) the settlement experience.  See Doc. 19-4.

On May 28, 2010, the Nelsons filed their Complaint in the Circuit Court of Berkeley County, West Virginia.  The Complaint alleged five counts against DRB and two counts against Eagle Excavating & Contracting, LLC ("Eagle"), including counts for fraud and negligence, gross negligence, and willful and wanton reckless misconduct. The Complaint alleged that "[t]he septic system was installed in an unworkmanlike fashion, in violation of numerous laws and regulations and in violation of acceptable building practice."  Compl., ¶ 6.  The Nelsons allege that DRB "knew the Class Two Septic system was illegal for the lot" and that DRB knew of other defects in the home prior to the sale, including "concrete significantly too soft throughout the basement and elsewhere, missing/incomplete bracing for trusses and gables in the roof system, unstable sub-grade soils beneath the home, broken concrete foundation walls and hidden water damage in the finished basement."  Compl. ¶¶ 8-9.

On August 6, 2010, DRB filed a Petition to Compel Arbitration in this Court pursuant to the Federal Arbitration Act.  On December 23, 2010, the Court dismissed DRB's petition to compel arbitration.  Dan Ryan Builders, Inc. v. Nelson, 2010 WL 5418939 (N.D.W. Va. Dec. 23, 2010).  The Court held that although DRB had satisfied preliminary requirements to compel arbitration under the FAA, the arbitration provision was unenforceable as a matter of law because it lacked mutual consideration.  DRB timely appealed to the Fourth Circuit Court of Appeals.

On appeal, the Fourth Circuit Court of Appeals found that West Virginia had no controlling decisions on whether additional consideration was needed for an arbitration

provision.  Dan Ryan Builders, Inc. v. Nelson, 682 F.3d 327 (4th Cir. 2012).  Therefore,

the Fourth Circuit certified the following question to the West Virginia Supreme Court of

Appeals:

> Does West Virginia law require that an arbitration provision, which appears
> as a single clause in a multi-clause contract, itself be supported by mutual
> consideration when the contract as a whole is supported by adequate
> consideration.

On November 15, 2012, the West Virginia Supreme Court of Appeals addressed the

certified question.  Dan Ryan Builders, Inc. v. Nelson, 737 S.E.2d 550 (W. Va. 2012).  In

answering the certified question, the court noted that parties frequently challenge the

enforceability of arbitration clauses on the ground that the clauses lack consideration or

lack equivalent promises.  However, the court held that "the formation of a contract with

multiple clauses only requires consideration for the entire contract, and not for each

individual clause." Id.  The court recognized that mutuality of obligation in the formation of

a contract is "a factor for a court to consider when assessing whether a contract (or

provision therein) is unconscionable." Id.  The court summarized its answer to the certified

question stating:

> West Virginia's law of contract formation only requires that a contract as a
> whole be supported by adequate consideration.  Hence, a single clause
> within a multi-clause contract does not require separate consideration.
> However, we further conclude that under the doctrine of unconscionability,
> a trial court may decline to enforce a contract clause–such as an arbitration
> provision–if the obligations or rights created by the clause unfairly lack
> mutuality.

Id.

On January 29, 2013, the Fourth Circuit acknowledged the West Virginia

Supreme Court of Appeals' answer.  Dan Ryan Builders, Inc. v. Nelson, No. 11-1215,

508 F. App'x 207 (4th Cir. Jan. 29, 2013) (unpublished).  The Fourth Circuit concluded

that the arbitration provision did not require separate consideration, and it remanded the

case to this Court to decide whether the arbitration clause was unconscionable under

West Virginia law.

On April 19, 2013, this Court held a Status Conference and Scheduling Hearing,

and the Court set a briefing schedule to address the issues in the case.  Additionally, on

November 15, 2013, this Court held a hearing where it listened to testimony and heard

arguments from counsel.  Accordingly, this matter is ripe for review.

## II.  Legal Standard under the Federal Arbitration Act

The Federal Arbitration Act ("FAA") applies to "[a] written provision in any . . .

contract evidencing a transaction involving commerce to settle by arbitration a

controversy thereafter arising out of such contract or transaction, or the refusal to

perform the whole or any part thereof . . . ." 9 U.S.C. § 2.  The FAA reflects "a liberal

federal policy favoring arbitration agreements."  Moses H. Cone Mem'l Hosp. v. Mercury

Constr. Corp., 460 U.S. 1, 24 (1983).  This policy is supported by Congress' view that

arbitration constitutes a more efficient dispute resolution process than litigation.

Hightower v. GMRI, Inc., 272 F.3d 239, 241 (4th Cir. 2001).  Therefore, "due regard

must be given to the federal policy favoring arbitration, and ambiguities as to the scope

of the arbitration clause itself resolved in favor of arbitration."  Adkins v. Labor Ready,

Inc., 303 F.3d 496, 500 (4th Cir. 2002).

A district court also applies "the federal substantive law of arbitrability, which

governs all arbitration agreements encompassed by the FAA."  Id. (citations omitted).

However, a district court applies ordinary state law principles governing the formation of contracts, "including principles concerning the 'validity, revocability, or enforceability of contracts generally.'" Muriithi v. Shuttle Exp., Inc., 712 F.3d 173, 179 (4th Cir. 2013) (citations omitted).  Section 2 of the FAA provides that arbitration agreements may be declared unenforceable "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  "This savings clause permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." AT&T Mobility LLC v. Concepcion, __ U.S. ___, 131 S. Ct. 1740, 1746 (2011) (quoting Doctor's Assoc., Inc. v. Casarotto, 517 U.S. 681, 687 (1996)).

To compel arbitration under the FAA, the Fourth Circuit held that a moving party must

> demonstrate "(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute,   (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute."

Adkins, 303 F.3d at 500-01 (quoting Whiteside v. Teltech Corp., 940 F.2d 99, 102 (4th Cir. 1991)).  "Under the FAA, courts must stay any suit 'referable to arbitration' under an arbitration agreement, where the court has determined that the agreement so provides, and one of the parties has sought to stay the action." Noohi v. Toll Bros., Inc., 708 F.3d 599, 604 (4th Cir. 2013) (citing 9 U.S.C. § 3).

## III.  Discussion

The Nelsons' motion to dismiss arbitration is based upon the following arbitration

clause contained in the contract:

**19. ARBITRATION.**

(a) Any dispute arising under or pursuant to this Agreement, or in any way
related to the Property and/or with respect to any claims arising by virtue
of any representations alleged to have been made by Us, or any agents
and/or employees thereof, (with the exception of "Consumer Products" as
defined by the Magnuson-Moss Warranty Federal Trade Commission
Improvements Act, 15 U.S.C. Section 2301 et seq. and the regulations
promulgated thereunder) shall be settled and finally determined by
arbitration and not in a court of law, irrespective of whether or not such
claim arises prior to or after Settlement hereunder, pursuant to the
Construction Industry Arbitration Rules and the Supplementary
Procedures for Residential Construction Disputes of the American
Arbitration Association ("AAA") then in effect.  Prior to commencing
arbitration, the dispute shall first be mediated in accordance with the
Construction Industry Mediation Rules of AAA, or another mediation
service designated by Us.  The parties hereto specifically acknowledge
that they are and shall be bound by arbitration and are barred from
initiating any proceeding or action whatsoever in connection with this
Agreement.  Notwithstanding anything to the contrary herein contained, in
the event You default by failing to settle on the Property within the time
required under this Agreement, then We may either (i) commence an
arbitration proceeding under this Section 19, or (ii) bring an action for its
damages, including reasonable attorneys' fees, as a result of the default in
a court having jurisdiction over the Purchaser.  You expressly waive your
right to mediation and arbitration in such event.  Each party shall be
entitled to full discovery in accordance with the local rules of court in the
event that arbitration is invoked under this Section 19.  The provisions of
this Section 19 shall survive the execution and delivery of the deed, and
shall not be merged therein.

(b) In the event that an action is brought in court under Section 19(a) or for any
reason a claim is determined not to be subject to binding arbitration under
Section 19(a), then You and Us knowing and voluntarily waive our rights to a trial
by jury in any action, proceeding or counterclaim related to this Agreement or the
Property, including such actions, proceedings or counterclaims in which You and
Us as well as others are parties.

Resp. Ex. 1, Doc. 63-1 ¶ 19.

11

A.      **All Four Elements Exist for Compelling Arbitration of Mr. Nelson's Claims**

As outlined above, for DRB to compel arbitration it must "demonstrate '(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute.'" Adkins, 303 F.3d at 500-01 (quoting Whiteside, 940 F.2d at 102).

1.      **A Dispute Exists Between the Parties**

The first element is readily satisfied.  DRB identified the existence of a dispute between the parties as the Nelsons filed suit against DRB in Berkeley County Circuit Court for alleged defects in the construction of their home.

2.      **A Written Agreement Includes an Arbitration Provision Purporting to Cover the Dispute**

The second element is also satisfied.  The contract between Mr. Nelson and DRB contains an arbitration provision at Paragraph 19 that purports to cover the dispute as to Mr. Nelson and DRB.  The Fourth Circuit Court of Appeals recognized that a court "may not deny a party's request to arbitrate an issue 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" Am. Recovery Corp. v. Computerized Thermal Imaging, Inc., 96 F.3d 88, 92 (4th Cir. 1996) (citing United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83 (1960)).   The arbitration clause is very broad and covers "[a]ny dispute arising under or pursuant to this Agreement, or in any way related

12

to the Property and/or with respect to any claims arising by virtue of any representations alleged to have been made by [DRB] . . . ."  Resp. Ex. 1, ¶ 19.  Additionally, the arbitration clause provides that "[t]he parties hereto specifically acknowledge that they are and shall be bound by arbitration . . . ."

In the underlying civil action, Mr. and Mrs. Nelson allege a variety of defects in the workmanship of the home, including "concrete significantly too soft throughout the basement and elsewhere, missing/incomplete bracing for trusses and gables in the roof system, unstable sub-grade soils beneath the home, broken concrete foundation walls and hidden water damage in the finished basement."  Compl. ¶ 9.  The Nelsons allege the "septic system was installed in an unworkmanlike fashion, in violation of numerous laws and regulations and in violation of acceptable building practice."  Compl. ¶ 6.  In reviewing the Complaint, Mr. Nelson's disputes arise under and pursuant to the contract and are related to their property.  Accordingly, the arbitration provision covers Mr. Nelson's claims against DRB.

### 3.     The Transaction Relates to Interstate Commerce

Mr. Nelson does not dispute that the transaction is related to interstate commerce.  The United States Supreme Court "interpreted the term 'involving commerce' in the FAA as the functional equivalent of the more familiar term 'affecting commerce'-words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power." Citizens Bank v. Alafabco, Inc., 539 U.S. 52, 56 (2003) (quoting Allied-Bruce Terminix Cos., Inc. v. Dobson, 513 U.S. 265, 273-74 (1995)).  The Court noted that "the statute provides for 'the enforcement of arbitration agreements within the full reach of the Commerce Clause,' therefore, it is perfectly clear

13

that the FAA encompasses a wider range of transactions than those actually 'in commerce'-that is, 'within the flow of interstate commerce.'" Id. (internal quotation marks, citation, and emphasis omitted).

In this case, the parties, Mr. Nelson and DRB, entered into a contract for construction of a home that was built with materials transported in interstate commerce. See EQT Corp. v. Miller, Civil Action No. 1:11CV197, 2012 WL 3839417, at *2  (N.D.W. Va. Sept. 5, 2012) (finding agreement related to interstate commerce because "the work performed under the relevant employment relationship involved a product which is largely commercially transported and sold in interstate commerce."). The agreement was between Mr. Nelson and DRB, a Maryland corporation, to construct a home in Berkeley County, West Virginia. The materials to construct the house were inevitably transported through the channels of interstate commerce. Therefore, the contract involved interstate commerce, and the third element is satisfied.

### 4.  The Nelsons Failed and Refused to Arbitrate the Dispute

The final element is also satisfied. The Nelsons failed and refused to arbitrate the dispute by filing the suit in Berkeley County Circuit Court rather than attending arbitration. Accordingly, all four elements exist for compelling arbitration.

### B.  "The Savings Clause": No Adequate Defense Exists to Prevent Enforcement of the Arbitration Clause

The Nelsons argue that the Court should refuse to compel arbitration because the arbitration clause is unconscionable. The Nelsons contend that the contract is one of adhesion as "[n]one of the terms of the contract were bargained for by the parties except the price" and "[t]he contract was full of pre-printed boiler-plate." The Nelsons

14

argue that the contract "contains a one way (or unilateral) arbitration clause," that essentially forces them, but not DRB, to arbitration. The Nelsons do not challenge the enforceability of the agreement as a whole; rather, they challenge the enforceability of the arbitration provision of the agreement, paragraph 19.  See Rent-A-Ctr., West, Inc. v. Jackson, 561 U.S. 63, 130 S. Ct. 2772, 2778 (2010) (holding that a party's challenge to an arbitration clause is for the district court to consider, but "a party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate").

Section 2 of the FAA permits courts to invalidate arbitration agreements using general contract principles. See 9 U.S.C. § 2.  "This savings clause permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue."  AT&T Mobility LLC, __ U.S. ___, 131 S. Ct. at 1746; see also Syl. Pt. 6, Brown v. Genesis Healthcare Corp., 724 S.E.2d 250 (W. Va. 2011) (Brown I) overruled on other grounds by Marmet Health Care Ctr., Inc. v. Brown, __ U.S. __, 132 S. Ct. 1201 (2012) ("Under the [FAA], 9 U.S.C. § 2, a written provision to settle by arbitration a controversy arising out of a contract that evidences a transaction affecting interstate commerce is valid, irrevocable, and enforceable, unless the provision is found to be invalid, revocable, or unenforceable upon a ground that exists at law or in equity for the revocation of any contract.").

On certified question from the Fourth Circuit, the West Virginia Supreme Court of Appeals noted that parties frequently challenge the enforceability of arbitration clauses

15

on the ground that the clauses lack consideration or lack equivalent promises.  Nelson,

737 S.E.2d at 558.  The Court held that "the formation of a contract with multiple

clauses only requires consideration for the entire contract, and not for each individual

clause."  Id.  Thus, a single clause within a multi-clause contract does not require

separate consideration.  However, the West Virginia Supreme Court of Appeals further

concluded that "under the doctrine of unconscionability, a trial court may decline to

enforce a contract clause—such as an arbitration provision—if the obligations or rights

created by the clause unfairly lack mutuality." Id.   Therefore, lack of mutuality of

obligation in the formation of a contract is "a factor for a court to consider when

assessing whether a contract (or provision therein) is unconscionable."  Id.

    "Unconscionability has generally been recognized to include an absence of

meaningful choice on the part of one of the parties together with contract terms which

are unreasonably favorable to the other party."  Brown v. Genesis Healthcare Corp.,

729 S.E.2d 217, 226 (W. Va. 2012) ("Brown II").  Under West Virginia law, courts

"analyze unconscionability in terms of two component parts: procedural

unconscionability and substantive unconscionability."  Nelson, 737 S.E.2d at 558

(quoting Brown I, 724 S.E.2d at 285).  In establishing procedural unconscionability,

courts look at "inequities, improprieties, or unfairness in the bargaining process and the

formation of the contract, inadequacies that suggest a lack of a real and voluntary

meeting of the minds of the parties."  Nelson, 737 S.E.2d at 558.  In assessing the

substantive unconscionability, a court may look to the "unfairness in the terms of the

contract itself, and arises when a contract term is so one-sided that it has an overly

16

harsh effect on the disadvantaged party."  Id.  In the substantive unconscionability

analysis, lack of mutuality in a contractual obligation is a proper element to consider. Id.

Therefore, "[i]f a provision creates a disparity in the rights of the contracting parties such

that it is one-sided and unreasonably favorable to one party, then a court may find the

provision is substantively unconscionable."  Id.

### 1. Procedural Unconscionability

The Nelsons argue that the contract is procedurally unconscionable for several

reasons.  First, the Nelsons contend that the contract is one of adhesion because the

terms were pre-printed; the terms were not negotiated between the parties, except for

the price of the home; and the contract was presented on a take it or leave it basis.

Second, the Nelsons contend there was an "inequality of the parties' bargaining position

. . . . [because] DRB controlled all the facts and the knowledge [Mr.] Nelson needed to

make a rational decision about the contract closing and withheld it from him." Resp.

Mot., p. 10.

Procedural unconscionability requires "gross inadequacy in bargaining power."

Adkins, 303 F.3d at 502 (quoting Troy Mining Corp. v. Itmann Coal Co., 346 S.E.2d 749,

753 (W. Va. 1986)).  The West Virginia Supreme Court of Appeals set forth the following

guidelines for determining procedural unconscionability:

> Procedural unconscionability is concerned with inequities, improprieties, or
> unfairness in the bargaining process and formation of the contract.
> Procedural unconscionability involves a variety of inadequacies that
> results in the lack of a real and voluntary meeting of the minds of the
> parties, considering all the circumstances surrounding the transaction.
> These inadequacies include, but are not limited to, the age, literacy, or
> lack of sophistication of a party; hidden or unduly complex contract terms;
> the adhesive nature of the contract; and the manner and setting in which
> the contract was formed, including whether each party had a reasonable

17

opportunity to understand the terms of the contract.

Syl. Pt. 17, <u>Brown I</u>.

The Nelsons argue that the contract was adhesive. "Procedural unconscionability often begins with a contract of adhesion." <u>State ex rel. Richmond Am. Homes of W. Va., Inc. v. Sanders</u>, 717 S.E.2d 909, 921 (W. Va. 2011). However, "[f]inding that there is an adhesion contract is the beginning point for analysis, not the end of it; what courts aim at doing is distinguishing good adhesion contracts which should be enforced from bad adhesion contracts which should not." <u>Id.</u> (quoting <u>State ex rel. Dunlap v. Berger</u>, 567 S.E.2d 265 (W. Va. 2002)). The West Virginia Supreme Court cautioned that although adhesion contracts include all form contracts submitted by one party on the basis of this or nothing, "[s]ince the bulk of contracts signed in this country, if not every major Western nation, are adhesion contracts, a rule automatically invalidating adhesion contracts would be completely unworkable." <u>Pingley v. Perfection Plus Turbo-Dry, LLC</u>, 746 S.E.2d 544, 550 (W. Va. 2013) (quotation marks and citation omitted).

First, the Nelsons assert that the contract Mr. Nelson entered into with DRB was a form contract. They argue that "[n]one of the terms of the contract were bargained for by the parties except the price" and that the contract was presented on a "take it or leave it basis" and "full of pre-printed boiler-plate" provisions. Resp. Mot., p. 5. Therefore, the Nelsons contend the contract is one of adhesion.

The West Virginia Supreme Court of Appeals defines adhesion contracts as "all 'form contracts' submitted by one party on the basis of this or nothing." <u>State ex rel. Dunlap</u>, 567 S.E.2d at 273. A contract of adhesion "leaves the subscribing party little or

18

no opportunity to alter the substantive terms." <u>Brown II</u>, 729 S.E.2d at 228 (quoting Syl. Pt. 18, <u>Brown I</u>).  Although the contract is pre-printed, the contract could be and was in fact negotiated.  The fill-in-the-blank provisions of the contract were for a description of the property being purchased, the base price of the home, the option price, the initial cash deposit amount, any additional cash deposit amount and date to be paid, the balance due at closing, the amount DRB contributes to closing costs, the option to use DRB's preferred settlement attorney, title company, and lender, or one of the purchaser's own choosing, and a listing of addenda, including blank spaces to enter any addenda not mentioned in the contract.  In this case, there are ten addenda, listed in the contract. <u>See</u> Resp. Ex. 1.

The Nelsons contend that Mr. Nelson negotiated only the price of the home and none of the other terms.  However, the contract and other statements indicate to the contrary.  Although the form was a "fill-in-the-blank" contract, the parties, DRB and Mr. Nelson, negotiated over the fill-in-the-blank terms, including the price and other details regarding the construction of the home.  Therefore, this was not a contract of adhesion as terms could be negotiated and modified.  Mr. Nelson had an opportunity to and in fact did alter the substantive terms of the contract.  For example, Mr. Nelson successfully negotiated over using an outside lender and keeping all of the incentives.

Additionally, the Nelsons provide no evidence that there were no meaningful alternatives to signing the contract with DRB.  The Nelsons were free to seek the services of another homebuilder, as DRB is not the only residential builder in operation in the Berkeley County area of West Virginia.  <u>See</u> <u>Ciampi v. Dan Ryan Builders, Inc.</u>, Civ. Action No. 3:10-CV-55 (N.D.W. Va. July 15, 2010); <u>see also</u> <u>Saturn Dist. Corp. v.</u>

19

Williams, 905 F.2d 719, 727 (4th Cir. 1990) ("[T]he mere fact that Saturn requires dealers to agree to its arbitration provisions in order to obtain a Saturn dealership does not make its Dealership Agreement non-consensual.  If a dealer does not wish to agree to non-negotiable arbitration provisions, the dealer need not do business with Saturn.").  Additionally, the Nelsons were represented by a professional licensed realtor, who certainly could have presented them with other options in the area.  Mr. Nelson also stated that he found a similar home in the Georgetown Orchard Subdivision on the Internet.  Therefore, Mr. Nelson conducted an independent search of available homes in the area, and he knew there were other builders, homes, and lots available to him.

Second, although the Nelsons have not directly argued that they are unsophisticated consumers and DRB is a large sophisticated corporation, it is proper for the Court to consider possible inadequacies in bargaining power, including the age, literacy, or lack of sophistication of a party.  See Syl. Pt. 17, Brown I.  The Nelsons are high school graduates and have some higher education.  Compare State ex rel. Saylor v. Wilkes, 613 S.E.2d 914 (W. Va. 2005) (weighing an employee's "tenth grade education" in favor of finding an employee agreement unenforceable).   Mr. Nelson received a Bachelor's degree from Excelsior College, and he has worked for years in the intelligence field.  He is currently employed as a supervisor at the Department of Health and Human Services.

Mr. Nelson did not allege his age weighs in favor of finding that he is an unsophisticated consumers.  Compare Arnold v. United Cos. Lending Corp., 511 S.E.2d 854 (W. Va. 1998) (finding an agreement unconscionable based upon predatory lending because United Lending was a national lending institution and the Arnolds were elderly,

uneducated consumers) *overruled on other grounds by* <u>Nelson</u>, 511 S.E.2d 854.  Mr.
Nelson did not allege that he was illiterate or unable to read the contract.  Mr. Nelson
also had the opportunity to review the contract containing the arbitration provision after
he signed the contract and prior to closing as he was provided with a copy of the
contract.  Mr. Nelson also admitted that he could have retained an attorney to review
the contract, but he did not.  Mr. Nelson failed to identify any conduct on the part of DRB
that prevented him from reading and reviewing the contract.  Mr. Nelson admitted that
when reviewing the contract, he was given an opportunity to ask questions about it, was
given enough time to read through it, and was not rushed into signing it.  Also, Ms. Ho
testified that Mr. Nelson was very astute and tedious. She described Mr. Nelson as
being very careful and taking his time in reviewing the documents.

Third, Mr. Nelson argued that the arbitration provision was not explained to them
or highlighted.  Mr. Nelson averred that "[a]t no point during the process was [he]
directed to the arbitration agreement nor did [he] read it."  N. Nelson Aff., ¶ 33.
However, there is no evidence or suggestion that Mr. Nelson attempted to opt-out of the
provision or negotiate its terms.  Also, there is no evidence that Mr. Nelson even asked
a question regarding the arbitration provision.

The arbitration provision was not hidden in a lengthy form contract.  Rather, the
pre-printed form contract was relatively short–seven pages.  The addenda was forty-
nine pages.  On page five of the contract, the page with the arbitration provision, the
heading is clearly marked in bold typeface and all capital letters: **19.  ARBITRATION**.
Additionally, Mr. Nelson initialed directly below the arbitration provision on page five.
Although Mr. Nelson claims he did not read the arbitration provision, he specifically

acknowledged when he signed the contract that he had read the contract and understood its provisions, including the arbitration provision.  This provision was obvious, as it was in all capital letters directly above the signature line on the last page.

Also, the arbitration provision in the contract briefly explained the process to the parties.  First, the provision explained that any claims arising from the contract or by virtue of alleged representations "shall be settled and finally determined by arbitration and not in a court of law."  Second, the provision stated that before "commencing arbitration, the dispute shall first be mediated."  This highlighted that mediation and arbitration are two different processes.  Last, the provision stated that the parties "specifically acknowledge that they are and shall be bound by arbitration and are barred from initiating any proceeding or action whatsoever in connection with this Agreement." This emphasized that arbitration is a binding process, and that parties are prohibited from initiating other proceedings or actions.  Additionally, Ms. Ho testified that her usual practice was to explain the arbitration provision and point out that if a problem arose between the purchaser and DRB, the purchaser was willing to go through arbitration instead of to judge and jury in order to save the company money.  Therefore, the arbitration provision in the contract provided some explanation of the process.

Fourth, the Nelsons argue that the contract was procedurally unfair because "DRB controlled all the facts and the knowledge [Mr.] Nelson needed to make a rational decision about the contract closing and withheld it from him, then made him pay for a lawyer who advised him to close even though lost his last chance to avoid arbitration by doing so."  Resp. Mot., p. 10.  Indeed, the Nelsons argue this Court should consider the issues regarding the construction of the home and the fact that DRB has used the same

22

settlement attorney in many real estate closings because the facts go to elements of deception, compulsion, and bargaining power.  Although DRB is a home builder in several states, there is no evidence that DRB is "either a monopolistic or olgopolistic position in [this] particular line of commerce."  Pingley, 746 S.E.2d at 551.

In viewing all the circumstances, the Nelsons have failed to demonstrate a gross inadequacy in bargaining power suggesting a lack of real and voluntary meeting of minds.  Mr. Nelson's age, literacy, education, the lack of hidden or unduly complex terms in the contract, and the manner and setting of executing the contract demonstrate that Mr. Nelson had a reasonable opportunity to understand the terms of the contract. Therefore, in light of all the facts, the Court does not find the contract was procedurally unconscionable.  Although West Virginia law requires a finding of "both 'gross inadequacy in bargaining power' and 'terms unreasonably favorable to the stronger party,'" this Court will also explain why it does not find substantive unconscionability. Adkins, 303 F.3d at 502 (quoting Troy Mining Corp., 346 S.E.2d at 753 (internal citations omitted)).

### 2.    Substantive Unconscionability

The Nelsons argue that the arbitration provision should not be enforced because it is substantively unconscionable.  The Nelsons point out that "DRB has the power to opt for either court or arbitration if it seeks to enforce the Agreement of Sale.  On the other hand, once DRB has [Mr.] Nelson's money, there are no other claims it might bring.  Whenever [Mr.] Nelson wishes to make a claim, however, he is bound to arbitration."  Resp.'s Mot., p. 11-12.

The West Virginia Supreme Court of Appeals explained that "[s]ubstantive

23

unconscionability involves unfairness in the contract itself–'overall imbalance, one-sidedness, *laesio enormis*, and the evils of the resulting contract'–and whether a contract term has 'overly harsh or one-sided results' or is 'so one-sided as to lead to absurd results.'" Brown I, 724 S.E.2d at 287 (internal citations omitted).  Courts must focus their inquiry on "whether the [contract] term is one-sided and will have an overly harsh effect on the disadvantaged party. To determine substantive unconscionability, courts have focused on vague matters such as the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns." Id. (internal citations omitted).  "Substantive unconscionability may manifest itself in the form of an agreement requiring arbitration only for the claims of the weaker party but a choice of forums for the claims of the stronger party." Brown II, 729 S.E.2d at 228.  Therefore, lack of mutuality of obligation is "a factor for a court to consider when assessing whether a contract (or provision therein) is unconscionable." Nelson, 737 S.E.2d at 558.

In this case, the Nelsons argue that the contract is substantively unconscionable because it lacks mutuality of obligation.  Paragraph 19 provides:

> in the event You default by failing to settle on the Property within the time required under this Agreement, then We may either (i) commence an arbitration proceeding under this Section 19, or (ii) bring an action for its damages, including reasonable attorneys' fees as a result of the default in a court having jurisdiction over the Purchaser.  You expressly waive your right to mediation and arbitration in such event.

Resp.'s Ex. 1, ¶ 19.

Upon reviewing the relative remedies of the parties, the Court finds that the arbitration provision is commercially reasonable.  Although DRB is permitted to seek a

remedy from the courts if Mr. Nelson defaults, this is a narrow remedy.  Essentially, the only instance when DRB may go to court rather than arbitration is to enforce the contract and recover damages in the event of default, which DRB admits is "failing to settle on a property."  For every other issue arising out of the contract, DRB must go to arbitration.  See Miller v. Equifirst Corp. of W. Va., Civil Action No. 2:00-0335, 2006 WL 2571634, at *11 (S.D.W. Va. Sept. 5, 2006) (finding an agreement was not so one-sided as to be unconscionable where the lender defendants retained access to a judicial forum for foreclosure and bankruptcy proceedings, but were required to arbitrate all other claims).  Therefore, the contract term is not so one-sided as to have an overly harsh effect on Mr. Nelson.  Additionally, this Court, as evidenced by the procedural unconscionability analysis, does not find that there is a gross inadequacy in bargaining power as Mr. Nelson is a sophisticated consumer with higher levels of education and training.  Taking into account Mr. Nelson's bargaining position when reviewing the contract, the Court does not find that the terms unreasonably favor DRB as to make the contract unconscionable.

In sum, considering the totality of the circumstances in this case, Mr. Nelson has failed to demonstrate that the contract and its terms were so unfair that it resulted in an overall imbalance or one-sidedness of the contract.  Therefore, the Court does not find substantive unconscionability.

### C.     Compelling Nonsignatories to Arbitration

The Nelsons argue that Mr. Nelson's wife, Angelia, is not bound to arbitrate her claims because she is not a signatory to the contract containing the arbitration provision.  Additionally, the Nelsons argue that any claims against Eagle should not be

25

subject to arbitration because Eagle was not a signatory of the contract.

As a general principle, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which it has not agreed to arbitrate." R.J. Griffin & Co. v. Beach Club II Homeowners Ass'n, 384 F.3d 157, 160 (4th Cir. 2004) (internal quotation marks omitted).  However, "[i]t is well-established . . . that a nonsignatory to an arbitration clause may, in certain situations, compel a signatory to the clause to arbitrate the signatory's claims against the nonsignatory despite the fact that the signatory and nonsignatory lack an agreement to arbitrate."  Am. Bankers Ins. Group, Inc. v. Long, 453 F.3d 623, 627 (4th Cir. 2006).

There are two circumstances when equitable estoppel allows a nonsignatory to compel arbitration: (1) "when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory" and (2) "when the signatory raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." Brantley v. Republic Mortg. Ins. Co., 424 F.3d 392, 395-96 (4th Cir. 2005) (internal quotations and citation omitted).  The Fourth Circuit Court of Appeals stated that "at a minimum, there must be allegations of coordinated behavior between a signatory and a nonsignatory defendant, and that the claims against both the signatory and nonsignatory defendants must be based on the same facts, be inherently inseparable, and fall within the scope of the arbitration clause."  Aggarao v. MOL Ship Mgmt. Co., Ltd., 675 F.3d 355, 374 (4th Cir. 2012) (internal citations and quotations omitted).

The West Virginia Supreme Court of Appeals has applied equitable estoppel as a

26

basis for enforcing a forum selection clause against signatories and nonsignatories to a contract.  See Caperton v. A.T. Massey Coal Col., Inc., 690 S.E.2d 323, 347 (W. Va. 2009) ("In order for a non-signatory to benefit from or be subject to a forum selection clause, the non-signatory must be closely related to the dispute such that it becomes foreseeable that the non-signatory may benefit from or be subject to the forum selection clause.") (noting cases applying equitable estoppel to bind a nonparty of a contract to the contract's arbitration or forum selection clause).  Additionally, arbitration clauses have been recognized as a form of a forum selection clause. Holmes v. Chesapeake Appalachia, LLC, Civil Action No. 5:11-cv-123, 2012 WL 3647674, at *12 (N.D.W. Va. Aug. 23, 2012).

### 1.    Claims Against Eagle

The Nelson's Complaint alleges two claims against Eagle.  First, the Nelsons allege that DRB and Eagle, "acting in concert, breached their duties to the Nelsons in a negligent, grossly negligent, and/or willful, wanton, reckless manner" in the design and construction of the septic system.  Second, the Nelsons allege that as a result of DRB's and Eagle's negligence, Angelia Nelson suffered severe bodily injury.

The Nelsons have alleged that Eagle, a nonsignatory to the contract, acted in concert with DRB, a signatory to the contract, to act in a negligent and reckless manner in the design and construction of the septic system.  Therefore, the Nelsons have alleged substantially interdependent and concerted misconducted by both DRB and Eagle.  Additionally, the Nelsons seek damages against Eagle and DRB, jointly and severally, for negligence, gross negligence, and willful, wanton, and reckless misconduct.  The allegations of their coordinated behavior is based on the same facts

27

as alleged in the Complaint, are inherently inseparable, and fall within the scope of the broad arbitration clause.

Mr. Nelson, a signatory to the contract, is equitably estopped from arguing that Eagle was not a signatory to the arbitration clause because his individual causes of action against Eagle in the underlying Complaint raises allegations of substantially interdependent and concerted misconduct by Eagle and DRB.  Accordingly, Mr. Nelson's claims against Eagle are compelled to arbitration.

### 2.    Claims Brought by Angelia Nelson

Angelia Nelson alleges several claims against Dan Ryan Builders, Inc. and Eagle Excavating and Contracting, LLC.  However, unlike her husband, Mrs. Nelson did not sign the contract containing the arbitration clause.  As a general principle, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which it has not agreed to arbitrate." R.J. Griffin & Co., 384 F.3d at 160.  However, "[i]t is well-established . . . that a nonsignatory to an arbitration clause may, in certain situations, compel a signatory to the clause to arbitrate the signatory's claims against the nonsignatory despite the fact that the signatory and nonsignatory lack an agreement to arbitrate." Am. Bankers Ins. Group, Inc., 453 F.3d at 627.  As discussed above, there are two exceptions to the general rule.

In this case, however, the two exceptions to the general rule do not apply. The first exception does not apply because Mrs. Nelson is not a "signatory to a written agreement containing an arbitration clause" that "rel[ies] on the terms of the written agreement in asserting [her] claims against the nonsignatory." See  Brantley, 424 F.3d at 395-86.  Indeed, Mrs. Nelson never signed the contract, and she is not bound by its

terms.  Additionally, the contract stated it was between "You and Us for the sale of land and a home."  "You" was defined as the "Purchaser who signs below."  Therefore, Mr. Nelson, as the only purchaser who signed the contract, was bound to the contract–not Mrs. Nelson.

The second exception does not apply because she is not a signatory "rais[ing] allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract."  Id.  Again, Mrs. Nelson is not a signatory to the contract.  Therefore, the two exceptions do not apply to Mrs. Nelson and her claims.  As a result, Mrs. Nelson's claims are not ordered to arbitration as she is not bound by the arbitration clause in the contract.

### IV.  Conclusion

For the reasons stated above, this Court finds that Respondents' Motion to Dismiss Arbitration should be, and hereby is, **DENIED IN PART and GRANTED IN PART**.  Accordingly, Mr. Nelson's claims against Dan Ryan Builders, Inc. and Eagle Excavating and Contracting, LLC are  **STAYED** and **SUBMITTED TO ARBITRATION** in accordance with Paragraph 19 of the Agreement of Sale.  The parties are **DIRECTED** to notify this Court forthwith upon the conclusion of the matter.  However, Angelia Nelson's claims against Dan Ryan Builders, Inc. and Eagle Excavating and Contracting, LLC  are **NOT COMPELLED TO ARBITRATION**..

It is so **ORDERED**.

The Clerk is hereby directed to transmit copies of this Order to all counsel of record herein.

**DATED:** February 6, 2014

GINA M. GROH
UNITED STATES DISTRICT JUDGE